This Gordon is supposed to be with us. He is unable to attend. He will listen to the tapes. Let me just remind the parties, this is not a microphone. It records your voices, so if you just speak up loud and clear. And I think that's it. Oh, I should say this to the parties. I'm not speaking for Justice Reyes, but we have read the facts, so you really don't have to argue the facts so much to us. It's more, of course, the law. And I'd ask both parties to address whose position or whose decision are they appealing and responding to it. Are you talking about the hearing officer or the circuit court? And depending, or both, and depending on who you are talking to. Whose opinion you are challenging, what standard of proof or standard of review you're going to ask us to impose on our review. And please, when you step up, identify yourselves for the record. And our clerk would call the case for us, please. Case number 11-2247, Gino Harvey, vs. City of Chicago School District 299. Good morning, Your Honors. May I first request to reserve five minutes for rebuttal? I'm Eric Pallas, counsel for the appellants, and as you know, also the appellant father in this case. The ruling that I have appealed, I think, is plainly the ruling of the circuit court. And because the circuit court dealt, first of all, on a closed administrative record, and also because its rulings, I think, as a matter of law, were inaccurate, the standard of review would be de novo. What was wrong about the circuit court opinion is that it essentially has adopted a per se rule that residential placement is an unreasonable response for an emotionally disabled student. Now, that's not the law. The law does not distinguish between types of disabilities. And that is confirmed by the numerous cases that I've cited where residential placements in the case of an emotionally disabled student have been provided. There's also, as you know, evidence in the record, first of all, that the Illinois State Board of Education has a list of accredited residential schools for placement, and that at the time that Gino was placed at Elan, Elan was one of those schools on the approved ISBE list. So just for the record, it's clear that what we're talking about here is the placement at Elan and not Aspen, correct? Correct. Okay. Correct. And that was a problem, I think, that, well, I've never asked for any reimbursement for Aspen. Aspen, we can concede, is not truly a school. Aspen is a therapy program, wilderness therapy program. The circuit court justified its ruling by discounting Jenna's problems as, quote, unquote, largely behavioral. Now, in that regard, it ignored the findings of the educators as well as the hearing officer, which is entitled to deference by the court, by that court and by this court, that Jenna suffered from an emotional disturbance and also a nonverbal learning disability. In fact, a hearing officer found that Jenna suffered from a serious emotional disturbance. Nonetheless, the circuit court applied Section 1412 of IDEA, which really, if you look at the cases involving that particular statute, is one for equitable adjustment, reduction, or a barring of residential placement or private school placement under certain circumstances based upon the conduct of the parents. The original opinion, as you may recall, was based in some part upon my supposed reaction to a letter from Mr. Rodriguez at the school board, but that was withdrawn. So now we're just left with the pure matter of policy. Is a residential placement unreasonable for an emotionally disabled student? And I believe that that is really… I really don't think that the court implied at all that there was a per se rule. Well, I'll flip through and take a look while I'm trying to make some other arguments, but I will say this, that the issue really was framed in terms of reasonableness, and I don't really believe that reasonableness… Let me ask you this. In regards to the placement at Elan, you indicated that part of it had to do with some of the emotional, psychological treatment that she received at Elan. What type of programs were instituted at Elan for educational purposes, and how were they tailored separate and apart from other students? To begin with, most of the students at Elan do have emotional issues, but the way they were done was small class sizes, and in a highly structured environment, and in conjunction with peer counseling, peer-to-peer relationships, as well as psychological counseling. This was necessary, I believe, because Dr. Yar, for example, the psychologist in Maine who was retained by CPS, said that without an appropriate setting, that is a highly supervised instruction setting, Jenna's deficits in emotional regulation skills would continue to impact her ability to be available for her education. Getting back to the academic component of Elan's curriculum, were there any classes that were specifically designed to Jenna's conditions? Not having been there, I can't comment on the actual curricular… Is there anything in the record that you can point us to that would indicate that there were specially designed academic classes for Jenna? Yes, well, individualized in the sense that they met the criteria that was required, which was that it was a small teacher-pupil ratio. The classes took place, as I recall, in the evenings after a day of other life skills and counseling, again, to make her emotionally available. But nothing that was designed individually for her? I would say that the curriculum was generally what you might expect for a high school education, or at least it had components for high school education, but again, within the context of a very small pupil-to-student ratio. The key issue is that both the circuit court and the hearing officer agreed that Jenna was denied FAPE, Free and Appropriate Public Education. And under those circumstances, my burden was simply to show that Elan was an appropriate environment that is reasonably calculated to provide the education that she needed. In that regard, I relied in part on the professional opinion of Dr. Rush, who said that she needed a highly structured, supportive environment. I believe if you look at Dr. Yar's report, Fairly Read, you would see that he confirms and validates the decision that it was an appropriate environment. During the course of the hearing, Cato Hawkins, a social worker, went so far as to say that Jenna could not have been educated in that environment. She could not have been educated outside this very highly structured residential environment, and again, compared what Elan was providing to Dr. Rush's recommendations and suggested that those were met. The one pernicious effect, I believe, of the public school's argument is this. They attempt to distinguish many of these cases, saying that the difference between the cases that I cite, the Babb case, the Murfreesboro case, is that CPS has the capability to provide Jenna FAPE. So what they're really saying simply is this. We were not unable to provide Jenna FAPE. We were simply unwilling to provide Jenna FAPE. And if that is the case, and if that is allowed to continue, then certainly the Chicago Public Schools don't really have to do anything to advance a student's progress, because they certainly have resources to provide that type of support. They simply didn't in this case. Well, in regards to the resources, and the record's clear that she succeeded, Jenna succeeded at Elan. Yes. What could have Lane Tech implemented to provide her the opportunity to succeed academically? Well, I don't know exactly. I mean, the hearing officer suggested kind of an ideal setup, which was never offered to Jenna, which was, again, a very small structured class with certified educational specialists. But noting that if that didn't work, there were therapeutic day school possibilities that might have existed. But doesn't the statute require that the board or the state provide individualized programming for individuals in Jenna's situation? They do. And what could have Lane Tech implemented? You know, I don't know, because Lane Tech never implemented it. You know, I'm not an educational expert. Again, if we look at what, you know, the hearing officer had a particularized statement of what he felt FAPE would involve, again, I suggest that it's kind of irrelevant to the discussion, because they didn't provide it. But again, I believe he talked about a very small contained classroom. I'm looking for the precise language. Well, let me ask you this, counsel. At the trial level and at the hearing level, the board hearing level, wasn't part of the relief that you were seeking is to have individualized academic programs for Jenna at Lane Tech? By the time, in 2009, by the time I actually sat down with CPS, yeah, I was looking for something that was somewhat different. I mean, she had already, or was just about to complete her high school education. I felt it was lacking in certain things, including driver's ed, computer training, certain things like that that she would require for college. So by the time of 2009, I was, you know, not precisely on a go-forward basis looking for any reimbursement. I had already, you know, reached into my pocket. My question doesn't go so much to reimbursement, but it goes to what's required under the statute in terms of the academic program. Yes, I was looking for an individualized program. Okay, and what type of individualized program were you looking for? Well, again, at that point, I was looking for driver's ed. I was looking for computerized training. I believe there was a language requirement there as well, right? They made a language requirement because Maine did not require the language requirement. So they said, the contingency was that they would attempt to provide the courses. And by the way, it turned out that the computer course was actually the only course. They only had one computer course and Jen had already passed it. It was the only three credits she had in two years there. So I was looking, actually, for them to allow her to take a video course that would have taught her Microsoft and the various types of programs that she would need for college at that time. In any event, I believe that it may be important, since it was such a paramount part of Applebee's brief, to discuss statute limitations. Am I done? No? Okay. I have one more question. You raised the issue about reimbursement. Yes. How much was being sought at the trial court level? Honestly, I'm not sure we ever got down to the exact numbers, but approximately $100,000 over the three-year period. And what was that based on? It was based on the actual tuition, $5,000 a month. At Elan? At Elan, that I paid. And again, let me emphasize this in terms of the denial of fate. There seems to be a view that my placement at Elan was an irrevocable decision. In fact, it was motivated by several factors, including the fact that when I was finally able to locate Jenna, the summer was on and there was no school available. She needed the therapy. But I was looking for a way to progress with her education. And I went immediately to the school in the fall, immediately after Labor Day, to ask them. I enrolled her in the school and asked for an appropriate placement, as Mr. Rodriguez had suggested that I do. When you said you enrolled her in the school? I'm sorry, Lane Tech. For purposes of... I went back in the fall. Although she was physically at Elan, I enrolled her in Lane Tech so that I could... Is that in the record? Because I don't remember reading that. I don't remember reading that at all. It should be. I would think it would be. If it's not, please don't argue it to us. Certainly when you said it would make the difference, but I don't remember reading that at all. I appreciate that, Judge. I think that is probably in my testimony in the... in front of the hearing officer. I do believe that if it's not... As you can appreciate, I lived it. Certainly, you've lived it. I understand it. Whether I did or not, I think the record is clear that from the fall, for the next 20 years, I tried to get some sort of alternative because it's also clear from the record that I couldn't afford Elan. It's also clear from the record that I wound up borrowing from my sister. That's in the hearing officer's record. No, I read that. That's why when you said that it just was something that stuck out. But the point is, the reason that I believe that FAPE was denied is that if there were other possibilities, for example, the environment that the hearing officer suggested, perhaps that there... The day school. The private day school. Anything like that. That was the type of situation I was looking for almost immediately. I hate to... I really hate to interrupt because you are at the point that my main question comes in. When you said the circuit court just said that your placement was unreasonable, but didn't they kind of say that your concern went beyond just this child's education? Because you didn't take something like a local, a private day school and that you put her somewhere else for purposes that went way beyond your desire for her education. Basically, for her safety. Yeah. Well, again, I think there was a problem with the circuit court's analysis in looking at that reasonable statute. I mean, I think if you look at the cases, obviously, I think sometimes it's more framed in terms of the relatedness of the supportive services. It is certainly true that my concerns were not limited although they were substantially concerned with Jenna achieving an education. The fact, however, whatever my motives were, I think are really irrelevant. I think you have to look at the educational setting and what was appropriate. And whether or not the residential setting was necessary under the cruel case to provide her with the education that she needed or dealt with issues that were quote unquote segregable. I believe that the evidence in this case was very clear that Jenna's emotional problems were so intertwined with her inability to be available for education that the type of supportive service that Alon provided was in fact necessary for her education. And I can tell you, I think that the evidence shows that I was principally concerned with her education for the reason that although Alon offers a life skills program, I pulled her out before she finished that. In other words, she didn't become the therapeutic, she wasn't a therapeutic success, but she got her credits, she got her educational credits. Can I ask a question with regards to the board's decision? They denied reimbursement here because they deemed that the, not so much the actions, but the appropriateness of the education in Alon. So given the fact that the board and the officials at the board made that determination, shouldn't the trial court judge have deferred to these officials' determination with regards to that issue? No, I don't think so. I think that this is something that the hearing officer, after deciding that the public schools denied Jenna Fabe, said that the placement was inappropriate because it didn't meet the least restrictive environment requirement. I believe I successfully argued based on the bad case, Murfreesboro, etc., that the least restrictive environment test is only a when the school board has provided Fabe. In other words, there were no alternatives. I don't have the ability to structure the program that, say, the hearing officer envisioned for Jenna to be provided by Wayne Tech. I kind of had one choice or the other. But doesn't the statute, doesn't IDA develop a team where the parents are actually included in developing, they have an input in developing the curriculum for the child? Under the perfect world, but the CPS... Well, doesn't that statute require that the parents be included along with the educators to determine what the curriculum should look like? Yes, it does. Therefore, you would be part of that development of the curriculum and what the classes should look like and what the curriculum should look like, right? I would have been and had the school engaged me in that process. I mean, I tried to engage them in that process from the fall of 2006 until the spring of 2009. And not once during that period of time did we have any sort of IEP meeting where we could have planned out that type of program. You're looking, Mr. Justice, as if that's a problem. But in fact, we never had, there was an IEP meeting that I was not invited to attend sometime in 2005, December 2005, I believe, and that clearly didn't work out very well for a variety of reasons, but ultimately I placed Jenna in the therapy program, which she needed, and then began to address with the school in the fall of 2006. While Jenna was at Elan, in the interim, to see what type of program, what type of IEP we could develop. The IEP requirement is that it be reviewed annually, but the school did not review it in 2006 to 2007, in 2007 to 2008, and in 2008 until the end of 2009. What was that delay due to? The delay was due to a lot of foot dragging on behalf of the school. Again, I think for what it's worth, the trial court concluded that I operated in good faith and tried to be as proactive as I could be to get the school to help in developing an alternate IEP for Jenna. I must be way over my time. You are. But we don't have another case, and this is very interesting. Okay. Well, may I address the statute of limitations issue? Well, the only thing I'd say about the statute of limitations issue is this, that it doesn't apply because the school board did not meet its obligations to provide me with notice of the statute of limitations. Now, despite the fact that I'm a lawyer, I'm not an educational lawyer, but in any event, the Supreme Court in the Rowley case points out that the IDEA, while it provides broad, substantive guidance, is very rigorous procedurally, and that those procedural requirements must be met. The school board very simply never provided me notice of a two-year statute of limitations, and I've cited two cases that mean in those circumstances, in the reply brief, the El Paso case and the Somerset Hills case, which suggested under those circumstances the statute of limitations doesn't apply. But the other point is that the school board now says, well, Mr. Rodriguez's letter was unequivocal that you were denied tuition reimbursement, and therefore your statute of limitations began at the moment you received that letter. Well, to me, I don't believe you could say that it was unequivocal in any sense. He essentially said, we have an IEP in place, and we're not going to change that IEP until we have a chance to review it, but by all means, contact our people and let's discuss what would be an appropriate placement. So to suggest that the Rodriguez letter was the end result of the CPS evaluation, rather than the beginning, is to suggest that everything they did thereafter was done in bad faith to delay and obscure the issue, and or that I should have reasonably known that that's what they were doing. The question always is when in a statute of limitations issue, when should I have known? The CPS during the course of the hearing, you know, during the administrative proceeding said that they had no obligation to present an IEP until 60 school days after I signed the consent for Dr. Yard's evaluation. I signed that in May of 2007. Sixty school days would have taken us well into the fall of 2007, given the end of the 2007 school year. I was certainly timely under that scenario. Additionally, the  I should have known at the one-year anniversary of the IEP, that is in December of 2006, that you weren't going to get any relief. Again, while I dispute that, it would seem to me that the appropriate reading of the statute would only mean that reimbursement can only go back to two years prior to the time that you bring suit. In other words, given the continuous denial of faith, it's being denied every day after December 1st of 2006. And therefore, even if your damages might be capped, say, by way of analogy, the Fair Labor Standards Act works that way. An employee could be 20 years at the job, but if they sue for a violation of FLSA, you can only keep that two years. And I would suggest to you that that would be a more appropriate reading of the way the statute would work in this case than that which is suggested by the employee. One question I have with regards to the limitations argument. There appears to be a record indication that RONA received a copy of the notice sometime in December. RONA appeared to have had a notice for an IEP. I don't know whether or not she received the due process. There's no record that she received the due process handout that they give. But even so, as I pointed out, if you look at the only one that's in the record, one that was given to me in 2009 and one that is dated 2007, you'll see that that due process notice is inadequate in terms of explaining to anybody that you have a two-year statute of limitations. So it kind of renders the issue moot. All right. Thank you, Counsel. Your Honors, may it please the Court, Counsel, Leigh Ann Louder on behalf of the Chicago Board of Education. I'll start with the statute of limitations argument since that's where he left off. First, he's alleging that there's a continuing violation exception. He didn't cite any cases for that proposition in his reply brief, and so for that reason he waived that issue. But even if he hadn't, there's a case, the only Circuit Court of Appeals case I could find on that is DK v. Abington School District. It's a Third Circuit Court of Appeals case that says continuing violations exception does not apply. There are three exceptions in the statute, equitable exceptions. Those are the exceptions that apply, not continuing violations. And I can give you that site if you'd like it for the Abington case. It's 696 F. 3rd. 233. So I don't believe the continuing violation theory gets him anywhere. As far as the statute of limitations, the trial court found that in dicta, she said that he should have known by December of 06 that the board wasn't going to take action. That was not clear error, and that's the standard that you're asked to apply here. Was that a clearly erroneous finding? No. There hadn't been any IEP meetings since December of 05. So one year later, there has to be an annual IEP meeting. There wasn't an IEP meeting by December of 06. That's the time he knew or should have known. And as far as him not being an educational lawyer, the court found that, or the hearing officer found he's a lawyer, if he chooses to represent himself and his child in a special education manner, then I think he should be held to the standard of a person who knows how to read the statute. And the statute required him to file his suit within two years. What about counsel's argument that the contents of the notice itself did not lay out the fact that there was a limitations problem? Mr. Rodriguez's letter included procedural rights, a long packet of procedural rights. He said that he got the letter, so he got the notice. Let me go back to the standard of review. You're asking whether it should be the trial court. If it's the trial court, I believe it's clear error, and she found that it was unreasonable to expect reimbursement when the problems Jenna was exhibiting were primarily behavioral. Now, Mr. Pallas argued that the hearing officer found that Jenna was, that the problems that were, that her emotional disturbance was being addressed at the line. That's not what the hearing officer found. He found that Jenna's emotional problems manifested in high-risk behaviors outside the school, in the community, and were not necessarily the school's concern. He also found that the evidence included the fact that many of Jenna's problems stem from parent-child management issues. Okay, I have a question with regards to the emotional and educational issues here. I mean, is there, are they intertwined, as counsel argues, or are they separate? Can they be separated? Yes, I think they can. Ilan, for example, Ms. Hawkins, testified that Jenna's problems were substance abuse, promiscuity, truancy, lying, disrespect for authority, refusing to follow the rules, extraordinarily self-destructive behavior, and poor peer relations. Those are not educational issues. Those are issues of parent-child management. There are some things the school can't do. The school can't get a kid out of bed in the morning and make him come to school. They can't make sure that a kid doesn't get sexually abused by her neighbor who's five years older than her. They can't make sure that the kid's not riding the train late at night, not at home. Those are things that schools can't do. Only parents can do that. And the schools, it's unreasonable to expect a school to do that. And that's what the trial court found, and that was not clear-er. I don't think they're arguing that the school should be a babysitter or a caretaker, but from what I understand from the record is that what they're arguing is that the emotional issues here are so intertwined with the educational issues that they cannot be separated. I think what they're arguing is that Jenna couldn't be educated unless she was confined. And the Seventh Circuit in the Dale M case said that schools don't have to provide confinement. They don't have to provide drug treatment. At the time he placed her at Elan, she was smoking 20 to 30 marijuana cigars a day. She was, you know, living with a pimp. Those are things... How does this case differ from the Dale M case? It's not. This case is just like Dale M. It couldn't be more... It's right on point with Dale M. He was out, he was using drugs just like Jenna. He was out committing crimes, as Jenna was, prostituting herself. The mother put her in Elan, the mother put him in Elan because he couldn't be educated otherwise. This is cases on all fours with Dale M. For that reason, I'd ask you to affirm the trial court's decision, unless you have other questions. I have a question with regards to the issue of reimbursement. In the Dale M case, reimbursement was denied. But the statute also allows for a deduction or reduction of what's requested in reimbursement. Can you address that? Yes, the statute does allow that, but it gives some reasons that you shouldn't do that. And I think two of them, well three of them apply here. The first is, the parents are required at the last IEP meeting before they decide to make a unilateral placement to come and tell the school why they don't think the school's placement is adequate. And here, the school's placement was that she was in a resource room, a small room where she had a special education teacher. And in two classes, she had a special education teacher who went with her. She was in the general education part of the school for geometry and another class, some sort of civics class. And a special education teacher went with her to those classes too. So that's what the school offered. Ms. Siegel didn't come and say that's not adequate. She said that's fine. And so that's why that it was one reason why we shouldn't have to reimburse. The second is that it was unreasonable. And the third is that, and I'm forgetting now, but there's a second sorry excuse me The second reason is ten business days prior to removing the kid from the public school the parent is supposed to notify us. He didn't do that. He removed her from the public schools on May 26th when he sent her to Aspen Achievement Academy. What about the letter to Mr. Duncan? That was made well after, more than ten days after he placed her in Aspen Achievement Academy. If you don't have any further questions, I'd ask you to affirm the trial. I have one other question in regards to the hearing. Counsel indicated that there was a request made for the hearing back in 2009, but the actual due process hearing didn't take place until 2010. And he indicated that it was because the board was dragging its feet. Can you address that, please? Yes, Your Honor. He says that he enrolled Jenna in Lane Tech after enrolling her in Elan. I don't remember that from the record. I do know that the record says that in November he placed Jenna in the summer of 2006. On November 17th, 2006, there's evidence that he called Lane Tech and asked for an evaluation of that Elan placement. I did see that. And there was an IEP meeting on November 28th of 2006, which he attended. And at that meeting, he was told that the board would have, because he had presented a psychological from the doctor out in Utah, that the board would need to have another, its own psychological. So that was an IEP meeting that occurred. He said no IEP meetings ever occurred. An IEP meeting did occur in November of 2006. Why did it take so long from the point in time when counsel had conversations with Ms. Martinez to when the actual meeting and process took place? Well, part of the reason was we hired a psychologist who didn't do a very good job. We hired a psychologist out in Maine. He said the dog ate his homework basically. He lost his report. He said he sent it to us. It was a mess. But when you decide to move your kid to Maine, it's kind of hard for the Chicago Public Schools to make an evaluation of him. I'm sorry. Go ahead. I thought I read this in the record. Maybe I'm wrong and both sides can correct me if I am. But I thought that the school had actually asked the parent to bring the child back to Illinois for the evaluation and that there was argument back and forth. And then there was an agreement that there would be a psychiatrist in Maine and that the father picked that psychiatrist in Maine. Maybe I'm misreading the record. No, that's exactly right. So the father actually picked that psychiatrist. No, the father didn't pick. But it's true that he first, there was an agreement that she should come back to Chicago for a two-day evaluation. And he asked the Chicago Board at that point, where is she going to stay when this evaluation is made? Because she can't stay at my house. So then he took the agreement back and said she wasn't going to come. She couldn't come to Chicago because the Elan people thought she was a flight risk. What does that sound like? Sounds like a prisoner. That sounds like what she's receiving in Elan is confinement. And so because he wouldn't allow her to come to Chicago, we asked Elan to provide some names of psychologists in Maine and we contacted the Maine State Board of Education to ask them for the names of some psychologists. We finally were able to identify Mr. Yar. He was our choice, but we made a bad choice. But didn't it take a year even after you received Dr. Yar's report before there was a meeting or a hearing with regards to these issues? Yes. Why did it take a year after you got Dr. Yar's report? I don't know. But I don't think that that's the important fact. I think he knew if he's seeking reimbursement, he knew or should have known when we said he couldn't have reimbursement that he needed to file for due process at that point. He didn't file for due process until three years later. Any other questions? Thank you. Briefly, Your Honors, first of all, with respect to so-called waiver, in the reply brief after the statute of limitations was raised, I certainly made this argument that at most there should be a limitation on the amount of reimbursement going back two years. But what is really waived is Ms. Lauder's ability to come before you today and to cite a case that was never sent to you or me as additional authority and an argument never made in any of her other pleadings. So that, in my view, is clearly waived. The fact that I'm a lawyer. Just because I certainly haven't read that case. I don't know if Judge Reyes has. I'm going to read it. So if you want to send us a reply to that case, you can certainly do so in the next ten days. Yes, I understand. But here we are today. Excuse me. I understand, Counsel. I said I want to read your case. But I'm going to allow Counsel to respond, you know, a page in ten days to that case. You know, again, I would suggest to you that there was nothing. We've been sitting in this courtroom, both of us, since about 930. There was nothing that would have prevented Ms. Louder from bringing a copy of the case. We're past that. In any event, IDEA requires as part of due process that certain notice requirements be given to you. When you, Justice Reyes, asked whether or not what the content of the notice, does the content of the notice provide for station limitations, Ms. Louder completely ignored your question and simply said he received a notice. Again, if you look at any notice, there's an August 2007 notice in the file, you will see that it does not advise a parent, and keep in mind, I was a parent here, of my due process rights. Let me, there were these two technical arguments, procedural arguments that were made. Again, I believe they were both waived, because they were not raised below or in the, either in the circuit court or below, and that is number one, having to do with Ms. Siegel's conduct. She's not a plaintiff in this case. So I don't know why I should be stopped from taking any position having to do with the conduct of Ms. Siegel, who no longer, or at least for a significant amount of time, did not have custody over Jenna. Secondly, again, the argument that I pulled Jenna out to go to Aspen Academy during the summer of 2006 is really irrelevant to my claim for reimbursement, which I met the procedural requirements of the 10-day letter, and that was never in dispute. My compliance with that 10-day rule has never been in dispute at any stage of these proceedings until raised in the appellate brief. I just want to talk about the Dale M case. Is it on all fours? No, it is not. For several reasons. First of all, there was no finding in that case, as there was in this case by both the circuit court and the hearing officer, that Dale M was denied faith. In fact, as we discussed earlier, he was already in a therapeutic boarding school at the time. Secondly, Dale M had a so-called conduct disorder. He was never identified as having an emotional disability, as was Jenna, nor was he identified as having a nonverbal learning disability, as was Jenna. And finally, the record clearly before Judge Posner and Dale M was significantly different than the one that was presented in this case, allowing Judge Posner to opine, you know, as far as we can tell, all it is is confinement. In this case, Kate Hawkins, social worker to one, discussed in detail the type of therapeutic environment that was there, the focus on the small group education, and the opinion that but for this environment, Jenna would not really be able to be educated. And again, confirmed also by Dr. Garrett for CPS. So Dale M is superficially the same because a lot was involved, but there was a world of difference between the record that was in front of the judge in that case. Again, I believe the more significant case is Jefferson County versus Elizabeth E, which is a Colorado case, 798F2-1177, where the judge there found that the girl's emotional problems were so intertwined with her ability to be educated, her availability for education, that a residential placement was the appropriate means. Finally, again, I would just simply say that there is no excuse. You know, let me say this. I am a lawyer, so perhaps I've developed a little bit more proactiveness, maybe I'm a little more aggressive than the average person, but I can tell you that it is a daunting exercise to try to get the type of supportive services that you need from the Chicago Public Schools when month after month, year after year, the bureaucrats procrastinate and ignore a problem that you've at least presented to them in the idea that they would try to help you solve. Thank you. We will take the case under advisement. We certainly have a lot to think about. Thank you both, and we are adjourned.